1  Heather A. Barnes (#263107)
2  William N. Riley (IN Bar No. 14941-49) (*pro hac vice* pending)
   Joseph N. Williams (IN Bar No. 25874-49) (*pro hac vice* pending)
3  PRICE WAICUKAUSKI & RILEY, LLC
   301 Massachusetts Avenue
4  Indianapolis, Indiana 46204
   Telephone:  (317) 633-8787
5  Facsimile:  (317) 633-8797
6  E-Mail: hbarnes@price-law.com
          wriley@price-law.com
7          jwilliams@price-law.com
8
   *Attorneys for Plaintiff*
9
                    UNITED STATES DISTRICT COURT
10
                  SOUTHERN DISTRICT OF CALIFORNIA
11

12 RORY W. COLLINS, individually and on
   Behalf of all others similarly situated,     '09 CV 2 1 5 1 JAH       JMA
13
                                                 CLASS ACTION COMPLAINT
14                          Plaintiff,
                                                 **DEMAND FOR JURY TRIAL**
15        v.
16
   GUITAR CENTER, INC., and
17 NATIONAL ASSOCIATION OF
   MUSIC MERCHANTS, INC.,
18
                            Defendants.
19
20
21
22
23
24
25
26
27
28

FILED

SEP 3 0 2009

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY            DEPUTY

-1-



# TABLE OF CONTENTS

**PAGE**

I.      NATURE OF ACTION ............................................................................................. 1

II.     JURISDICTION AND VENUE.............................................................................. 2

III.    PARTIES................................................................................................................. 3

IV.     INTERSTATE TRADE AND COMMERCE...................................................... 4

V.      SUBSTANTIVE ALLEGATIONS....................................................................... 5

      A.      During the Class Period, NAMM was the Industry's Vehicle to Control Prices in the United States Fretted Instrument Product Market .............................. 5

      B.      No Legitimate Business Reason for MAP Policies, Price Restrictions and Restrictions on Discounting ................................................................................ 13

      C.      The FTC Action ....................................................................................... 15

      D.      Anti-Competitive Effects of Defendants' Unlawful Conduct................................ 18

      E.      Relevant Market ....................................................................................... 19

      F.      Market Effects of Defendants' Conduct.............................................................. 20

VI.     CLASS ACTION ALLEGATIONS......................................................................... 21

VII.    TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, AND EQUITABLE TOLLING ........................................................ 24

FIRST CLAIM FOR RELIEF (Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1)........................................................................................................................ 25

PRAYER FOR RELIEF......................................................................................................... 26

DEMAND FOR JURY TRIAL............................................................................................... 27

i

Plaintiff, Rory W. Collins (the "Plaintiff"), for his Class Action Complaint against Defendants, upon personal knowledge as to facts pertaining to himself and upon information and belief as to all other matters, state as follows:

## I.      NATURE OF ACTION

1.      Plaintiff, a consumer and a direct purchaser of Martin Guitar strings ("Martin Strings") from Guitar Center, Inc., one of the defendants herein, brings this action on his own behalf and on behalf of a class of purchasers of fretted musical instrument products such as acoustic and electric guitars, violins, amplifiers and strings ("FI Products") between January 1, 2005 and December 31, 2007.

2.      Plaintiff seeks damages from Defendants under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  As detailed below, Plaintiff alleges that Guitar Center, a dominant, multi-brand retailer and a member of the National Association of Music Merchants ("NAMM"), together with NAMM and its members, conspired to maintain, implement and/or enforce Minimum Advertised Pricing ("MAP") policies that had the purpose and effect of fixing prices, securing higher price levels, restricting retail price competition and eliminating price discounting altogether in the Fretted Instrument ("FI") market.

3.      Specifically, from at least 2005-2007, and earlier, NAMM organized meetings and programs where competing FI retailers, including Guitar Center, were permitted and encouraged to discuss and agree regarding the restriction of retail price competition, strategies for the adoption, implementation, and enforcement of minimum advertised price policies, and appropriate and optimal retail prices and margins.  In effect, NAMM facilitated resale price maintenance ("RPM") agreements between and among its members (hereinafter, MAP and RPM are used interchangeably).

4.      The NAMM meetings led to agreements between Guitar Center, other leading FI retailers, and FI Product manufacturers to impose RPM scheme designed to raise and maintain retail prices for FI products.

5.      Defendants' conduct unreasonably restrained trade in the relevant market(s) (defined below), causing substantial anti-competitive effects and inflated prices to consumers, in violation of § 1 of the Sherman Act.

6.      NAMM's conduct and that of other defendants named herein, all of whom are members of NAMM, are illegal under Section 1 of the Sherman Act.  The conduct of defendants, and each of them unreasonably restrained trade in the relevant market(s) (defined below), causing substantial anti-competitive effects and inflated prices to consumers.

7.      Absent defendants' anti-competitive conduct, plaintiff and the other Class members would have paid lower prices for the FI Products they purchased during the Class Period.  Plaintiff thus seeks damages and equitable relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

## II.      JURISDICTION AND VENUE

8.      The Court has jurisdiction over the claims relating to violations of the Sherman Antitrust Act of 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 15.  Jurisdiction is also proper under 28 U.S.C. § 1332(d)(2).

9.      Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391.  Defendants transact business within this district, many of the acts and events giving rise to this action occurred within this district; and Defendant NAMM is headquartered in this district.

## III.   PARTIES

10.     Plaintiff Rory W. Collins is a resident of Indianapolis, Indiana.  In or about the time period of 2005 - 2007, Plaintiff purchased several sets of Martin Strings from Guitar Center.

11.     Defendant Guitar Center, Inc. ("Guitar Center") is a Delaware corporation with its principal place of business at 5795 Lindero Canyon Road, Westlake Village, California, and is a retail seller of FI Products.  Guitar Center is a member of NAMM.  Guitar Center has grown aggressively through acquisitions.  As of the end of 2008, Guitar Center's annual sales of $1.55 billion were more than one-fifth of the annual sales of all musical instruments of $7 billion. Guitar Center is the only national chain and is viewed as dominant in the retail market with 295 stores and the industry's largest mail order operation.  Guitar Center was nearly five times the size of its nearest competitor by 2007.  From 1997 to 2007, its market share grew from 6.1% to 26.6%.

12.     Guitar Center is, according to its own publicly filed financial reports in 2007, the largest customer of many of its suppliers and thus each manufacturer depends on Guitar Center for substantial portion of its sales of guitars.

13.     Defendant National Association of Music Merchants, Inc. ("NAMM") is a New York corporation with its principal place of business located at 5790 Armada Drive, Carlsbad, California 92008.

14.     NAMM is a trade association comprised of more than 9,000 members, including defendants, that includes manufacturers, distributors, and dealers of musical instruments and related products.  Most United States manufacturers, distributors, and dealers of musical instruments are members of NAMM.  NAMM is controlled by its members, including defendants herein.

3

15.    The musical instrument product market is characterized by significant barriers to entry which enhances Guitar Center's dominance and influence and allowed defendants to exercise and maintain control over prices of fretted instruments.

16.    Plaintiff is informed and believes and thereon alleges that as to all transaction relevant herein, each defendant was an agent of one or more defendants named herein and, as such, was acting within the purpose, course and scope of such agency.  Plaintiff is further informed and believes that each defendant aided and abetted, and acted in concert with and/or conspired with each and every defendant to commit the acts complained of herein and to engage in a course of conduct in the business practices complained of herein.

17.    Various individuals, partnerships, corporations and associations not named as defendants in this Complaint have participated as co-conspirators in the violations of law alleged herein and have performed acts and made statements in furtherance thereof.  The identity of all co-conspirators is unknown at this time and will require discovery.

### IV.    INTERSTATE TRADE AND COMMERCE

18.    The activities of Defendants, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

19.    During the time period covered by this Complaint, Defendant Guitar Center and members of Defendant NAMM sold and distributed FI Products throughout the United States.

20.    Defendant Guitar Center and members of Defendant NAMM have sold and shipped substantial quantities of FI Products in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which the Defendants and NAMM's members produced FI Products.

## V.   SUBSTANTIVE ALLEGATIONS

**A.   During the Class Period, NAMM was the Industry's Vehicle to Control Prices in the United States Fretted Instrument Product Market**

21.    Most U.S. manufacturers, distributors, and dealers of musical instructions are members of NAMM.  As the FTC observed in its March 4, 2009 press release entitled *National Association of Music Merchants Settles FTC Charges of Illegally Restraining Competition*, "NAMM serves the economic interests of its members by, among other things, promoting consumer demand for musical instructions, lobbying the government, offering seminars, and organizing trade shows.  In the United States, NAMM sponsors two major shows each year, where manufacturers introduce new products and meet with dealers and competing manufacturers, distributors and retailers of musical instruments meet and discuss issues of concern to the industry."  *See* http://www.ftc.gov/opa/2009/03/namm.shtm.

22.    On information and belief, from the late 1990s to at least 2007, Defendants worked to facilitate uniform agreements both as to the implementation and enforcement of MAP as well as pricing.  The purpose of facilitating agreement both as to MAP policies and pricing was because Guitar Center, as well as other retailer members of NAMM, were concerned about increased competition by mass merchants, such as Wal-Mart and Costco, as well as interest retailers.[1]

23.    NAMM held biannual trade shows and conventions.  NAMM shows are considered an indispensable resource by music product retailers.  In a February 2007 interview a member was quoted in Musical Merchandise Review:

> Many years ago, the importance of attending a NAMM show may
> not have seemed important, today it is absolutely necessary.
> Owners and key personnel should be at NAMM . . . the education

---

[1] "Exhibitors Speak:  candid comments on business, the NAMM show, dealers and what to expect in 2006," Music Trades (March 1, 2006); "Justified Optimism or rose-colored glasses?" Music Trades (March 1, 2006). *See also* FTC Complaint, ¶ 4.

seminars are priceless.  The interaction with the industry people and colleagues is also priceless.

24.     In the late 1990s or early 2000s, at a NAMM show, "a high-profile retailer delivered a stinging address, lamenting the fact that manufacturers sat by idly as price wars raged and retail profits plummeted."[2]  This address coincided with the adoption of MAP policies by leading musical instrument manufacturers, which commenced in 1999 and continued thereafter.[3]

25.     By the early 2000s, several major music retail chains, including Guitar Center, were expressing a heightened concern for margin and profit protection.

26.     According to independent retailers, Guitar Center wields enormous power in the industry.  In an interview in Musical Merchandise Review, April 2007 issue, Alan Levin of Chuck Levin's Washington Music Center said:

> The biggest concern is Guitar Center.  They are many manufacturers' biggest customers and changes are being made . . . to suit them alone.

Similarly, one NAMM member observed: "Guitar Center has too much leverage. . ."[4]

27.     Thus, when Guitar Center and NAMM encouraged and required the implementation of MAP pricing, manufacturers did so for fear of losing Guitar Center as a customer.

28.     In fact, a major shift in retail opinion regarding the effectiveness of MAP policies to protect profits occurred between 2000 and 2001.  A poll conducted by Music Trades magazine revealed that:

[2] "Do MAP policies work?"  Music Trades (August 1, 2001).

[3] FTC Complaint, ¶ 4.

[4] As reported in the March 1, 2008 issue of Music Trades.

> Last year [2000] when we polled leading m.i. dealers about the
> value of minimum advertised price (MAP) policies, only 31% said
> they had a positive effect on gross margins, 60% said that MAP had
> no effect at all on selling prices, while 9% said the programs
> actually decreased margins.  When asked the same question this year
> [2001], retailers expressed a major change of heart.  51% said that
> MAP policies had improved their gross margins during the past 12
> months, and only 44% deemed the policies ineffectual.[5]

29.     Music Trades concluded that the 20-point shift in opinion was due to the fact that

"the biggest benefit of MAP policies has been to rid the internet of loss-leader pricing."  Music

Trades explained:

> As a result [of the MAP policies], these days when you type the
> name of a popular product into a search engine, you'll get a screen
> full of results offering the same MAP regulated price.  As our poll
> indicates, brick-and-mortar retailers obviously appreciate the fact
> that they don't have to deal with a legion of customers coming into
> the store brandishing a computer print out and demanding, 'Why
> can't you beat this price?'[6]

30.     In addition to reducing competition from internet retailers, Music Trades also

credited MAP policies with a more "sane approach to industry pricing," stating that "retail

margins appear to have stabilized."[7]

31.     Thus, MAP policies were a hot topic at the January 2001 NAMM trade show.

Music Trades reported that retailers' then-current gross margins of 27% to 32% were far lower

than they had been in the 1990s, and that both large and small retailers "have jointly concluded

that they simply can't afford to give up any more gross margin points."[8]

---

[5] "Do MAP policies work?"  Music Trades (August 1, 2001).

[6] "Do MAP policies work?"  Music Trades (August 1, 2001).

[7] "Do MAP policies work?"  Music Trades (August 1, 2001).

[8] "Brick and Mortar Gets New Respect," Music Trades (March 1, 2001)

32.     In response to this joint retailer pressure, at the January 2001 NAMM show, "manufacturers seemed to be doing more than paying lip service to retail profit concerns" by rolling out new and more restrictive MAP policies.  However, on information and belief, the manufacturers realized and agreed that the MAP policies were not designed to increase services at the retailers but merely to protect their profit margins.  In fact, manufacturers allegedly "were fulsome in their criticisms of the industry's retail network," stating, *inter alia*:  "'They don't do any marketing,'" and "'Their stores are staffed with minimum wage idiots.'"[9]

33.     Thus, the result of the January 2001 NAMM show, and the discussion facilitated by NAMM at that show, was that manufacturers realized that they could no longer rely on brilliant engineering and design, but instead agreed to implement "[a] distribution scheme that enables retailers to make a respectable gross margin. . ."[10]

34.     At the January 2002 NAMM show, NAMM continued to facilitate discussion among its members on the optimal use of MAP policies.  As a result, manufacturers "acknowledged the retail concern with profitability by instituting minimum advertised price, or MAP policies.  In fact, mention of MAP pricing was routinely included in just about every new product presentation."[11]

35.     At these shows, on information and belief, NAMM encouraged dealers to, and dealers agreed to and did, outline their MAP policies.  But the dealers did not do so in conjunction with requests for retailer advertising, in-store displays, better product demonstrations or

---

[9] "Brick and Mortar Gets New Respect," Music Trades (March 1, 2001)

[10] "Brick and Mortar Gets New Respect," Music Trades (March 1, 2001)

[11] "Blue skies ahead?  Expectations were low, but Christmas sales came in strong, and retailers flocked to Anaheim, making for a high energy show . . . Does this mean the recession is over and industry growth is back on track?; NAMM in Anaheim 2002." Music Trades (March 1, 2002).

8

knowledgeable store staff.  Rather, the MAP policies were agreed to at the behest of Defendants and rolled out at the NAMM shows with the retailer profitability in mind.

36.     For example, at the Summer 2004 NAMM show, "[a] number of exhibitors also announced higher MAP prices in a bid to shore up dealer margins.  As one supplier noted, 'The truth is, there isn't a lot of difference between our products and our competitors.  If we're going to get dealer support, we've got to make these guys money.'"[12]

37.     Similarly, at the NAMM show in summer 2005, Peavey Electronics (among others) outlined its MAP policy, reiterating "Peavey's commitment to dealer profitability."[13]

38.     But NAMM did not only encourage individual dealers or retailers to discuss and agree how to restrict price competition.  In fact, it facilitated joint discussions by all members of NAMM.  At NAMM's biannual trade shows and conventions, NAMM hosted "NAMM Show University Sessions."  These sessions were designed to facilitate discussion and education on a wide variety of music industry topics, including price competition and restrictions to competition.

39.     At the January 2006 trade show, NAMM hosted several sessions regarding MAP policies.

40.     For example, NAMM facilitated a panel discussion regarding MAP policies.  On a panel comprised of industry heavy-hitters, such as the Vice President and General Manager of Yamaha's Pro-Audio and Combo division, sales managers from Kaman Music Corp. and Avedis

---

[12] "NAMM's grand finale in Nashville:  strong buying, product shortages, exuberant entertainment, and confidence in the second half made the last NAMM show in Nashville one to remember; Nashville NAMM Report 2004," Music Trades (September 1, 2004).

[13] "Peavey 40th anniversary dealer meeting," Music Trades (September 1, 2005).

Zildjian, and several retailers, the suppliers were "unanimous, offering a guardedly positive assessment of MAP policies."[14]

41.     At this panel, there was just one lone voice that supported competition on prices. Bryan Junk of massmusic.net asked that Panel and the audience, "We're supposed to compete, aren't we?"  According to one industry report of the Panel session:

> Whether or not you agree with him, Bryan Junk, an internet retailer, deserves credit for staring down an auditorium packed with independent retailers and stating that MAP should be scrapped.  To audible boos, he declared, 'Consumers like low prices, and we try to give them what they want.  Why shouldn't we be able to grow our business by offering the lowest possible prices without interference from the manufacturers?'

42.     However, Mr. Junk's view was not the consensus.  In fact, the Panel discussed that, absent MAP, "prices would rapidly migrate down to 10% over cost . . ."  The Panel even advocated revising the current MAP prices "upwards to give retailers a better profit margin."

43.     The Panel also discussed how to enforce the MAP policies, agreeing that "MAP is only as effective as its enforcement . . ."  The Panel thus discussed how to enforce MAP, particularly with the proliferation of Internet sites.

44.     NAMM also released a report based on comments it compiled from the January 2006 trade show participants and attendees.  NAMM released the following poll results, in which it provided the answers:[15]

> What do independent retailers view as a threat to their business and profitability?  On a 1 to 5 scale, with 5 being extremely concerned, rate the following issues.  (Report is average of responses.)

---

[14] "MAP policies on trial:  Do they help?  Do they hurt?  Is there a better way?" Music Trades (March 1, 2006).
[15] "Justified Optimism or rose-colored glasses?" Music Trades (March 1, 2006).

3.4     The expanded presence of music products in mass merchants, like Wal-Mart and Costco.

3.2     Competition from internet and catalog merchants.

*        *        *

2.5     MAP pricing policies that set margins too low.

45.     NAMM hosted another session entitled, "Does the Industry Need a MAP makeover?"  At this session, Music for Everyone ("MFE"), a California retailers association, presented a "voluntary MAP formula/guideline" which it "recommended for general use . . ."[16]

46.     MFE published, and presented at the January 2006 NAMM trade show with NAMM's participation and consent, the following two pricing formulas based on retail cost and which were "designed for all instruments and all combo and audio products"[17]:

Proposed MAP Formula
Recommended Minimum Profit Formulas for A & B Discounts

*        *        *

Retail [$1-$149] x 0.5 x 2.00 = MAP (0% off retail)*
Retail [$150-$249] x 0.5 x 1.90 = MAP (5% off retail)*
Retail [$250-$299] x 0.5 x 1.85 = MAP (7.5% off retail)*
Retail [$300-$349] x 0.5 x 1.80 = MAP (10% off retail)**
Retail [$350-$399] x 0.5 x 1.75 = MAP (12.5% off retail)**
Retail [$400-$449] x 0.5 x 1.70 = MAP (15% off retail)*
Retail [$450-$499] x 0.5 x 1.65 = MAP (17.5% off retail)**
Retail [$500 and up] x 0.5 x 1.60 = MAP (20% off retail)*
Retail [$550-$599] x 0.5 x 1.55 = MAP (22.5% off retail)**
Retail [$600 and up] x 0.5 x 1.50 = MAP (25% off retail)**

* Formula A
** Formula B

---

[16] "Marketplace realities demand new approach to MAP policies:  with fixed costs the same on all merchandise, a sliding pricing scale makes sense," Music Trades (November 1, 2005).

[17] "Marketplace realities demand new approach to MAP policies:  with fixed costs the same on all merchandise, a sliding pricing scale makes sense," Music Trades (November 1, 2005).

11

47.     MFE explained that the formulas were designed to permit "[f]ormula discounts from retail start[ing] at zero" and to provide a "much higher" profit percentage for lower-priced products."[18]

48.     MFE even went so far at the NAMM show to encourage manufacturers to adopt the MAP pricing reflected in Formula A, capping permitted discounts at 20% and stating that Formula A "is likely to be . . . accepted widely."  Nonetheless, MFE stated that no MAP pricing should be lower than that reflected in Formula B, stating "the formula B profits are the minimum that brick-and-mortar full service music instrument retailers require to survive, and hopefully thrive."[19]

49.     At the 2006 Summer NAMM show, NAMM again held an industry panel discussion, comprised of the NAMM president, a vice president of Yamaha, and the Chairman and CEO of Fender Musical Instruments, among others.[20]  NAMM touted this roundtable as follows: "In the two-hour session suppliers and retailers of all sizes will be able to share views about critical issues affecting profitability, including MAP pricing, Internet sales tax, and the entrance of

---

[18] "Marketplace realities demand new approach to MAP policies:  with fixed costs the same on all merchandise, a sliding pricing scale makes sense," Music Trades (November 1, 2005).

[19] "Marketplace realities demand new approach to MAP policies:  with fixed costs the same on all merchandise, a sliding pricing scale makes sense," Music Trades (November 1, 2005).

[20] "Austin goes all out for NAMM: Austin got high marks as a fabulous trade show venue, but attendance levels barely made a passing grade.  Nevertheless, the industry still seems committed to a summer show. The only question, were to have it; Part 2; Company review," Music Trades (September 1, 206).

mass consumer merchandisers into the industry."[21]   Among the topics facilitated at this meeting were MAP prices that were set too low and profit margins.[22]

50.     NAMM continued to facilitate industry discussions of MAP pricing at its 2007 Winter show.  One roundtable discussion focused on, *inter alia*, increasing profit margins and MAP pricing.[23]

51.     Thus, NAMM organized meetings and programs for its members at which competing retailers of musical instruments, as well as manufacturers of those instruments, were permitted and encouraged to exchange information and discuss strategies for implementing minimum advertised price policies, the restriction of retail price competition, and the need for higher retail prices.

52.     Representatives of NAMM determined the scope of information exchange and discussion by selecting moderator and setting the agenda for these programs.

53.     At these NAMM-sponsored events, NAMM members discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies; appropriate and optimal retail price and margins; and other competitively sensitive issues.

**B.     No Legitimate Business Reason for MAP Policies, Price Restrictions and Restrictions on Discounting**

---

[21] "Get ready for a memorable show as the world's live music capital hosts NAMM; NAMM PREVIEW; Summer Session In Austin," Music Trades (July 1, 2006).

[22] "Austin goes all out for NAMM:  Austin got high marks as a fabulous trade show venue, but attendance levels barely made a passing grade.  Nevertheless, the industry still seems committed to a summer show.  The only question, where to have it; Part 2, Company overview," Music Trades (September 1, 2006).

[23] "Why going to NAMM is a total no-brainer: new products, smart people, and tons of educational sessions add up to the single biggest opportunity of the year.  If you're serious, there's only one thing to do: Show Up!; NAMM 2007 PREVIEW; Calendar," Music Trades (January 1, 2007).

54.     Relative to Guitar Center and other retail members of NAMM, internet based retailers are small companies that compete in the relatively new trade channel known variously as "electronic commerce," "e commerce," "e tailing," "internet retail," etc.  Internet retailers of FI products are highly efficient competitors because, among other reasons, their operating expenses are low.  This allows them to compete vigorously on price, both with other internet retailers and with retailers in other trade channels, such as Guitar Center (which operates through "brick and mortar" stores as well as on the internet).  Thus, when allowed to compete freely, internet retailers' price competition enhances consumer welfare by bringing down prices.

55.     By the 2000s, NAMM and its members recognized that the increased popularity of "e-commerce," with its associated increase in price competition, posed a substantial threat to NAMM's members' sales and profits.  Thus, NAMM, whose retail members are generally considered "traditional" brick-and-mortar retailers because they primarily sell products through their physical store locations, considered ways to thwart internet retailer competitors.

56.     NAMM's, and its members', response to internet retailing was both predictable and anticompetitive.  As recognized at an FTC 2002 public workshop, entitled "Possible Anticompetitive Efforts to Restrict Competition on the Internet," one expert explained:

> The promise of the world of electronic commerce is to create an environment where consumers can freely shop between various competitive alternatives.  **By reducing transaction costs and improving transparency, the Internet offers the potential of dramatically improving competition in various retail markets.**
>
> \*       \*       \*
>
> **[But] as new market forces arise, . . . "traditional" competitors often respond to the threat by trying to create barriers to thwart those new entrants.**

14

*See* David A. Balto, Testimony Before the FTC, Office of Policy Planning, Public Workshop on E-Commerce, at 1-2 (October 10, 2002) (emphasis added).

57.     Just as the experts predicted, NAMM encouraged its members to devise an illegal plan to combat internet retailers by exacting agreements from the manufacturers of FI products being sold through Guitar Center and NAMM members' stores (or that desired to sell products at their stores) to require, on penalty of termination and as a condition of doing business with them, that the manufacturer ensure that its other retailers refrain from discounting.

58.     NAMM facilitated the discussion of, and sought and obtained the agreement of its manufacturer members, to impose and enforce MAP policies solely for Guitar Center and its retail members' benefit and not for any legitimate pro-competitive reason.

## C.     The FTC Action

59.     In March 2009, the Federal Trade Commission ("FTC") issued a cease and desist order to NAMM and at the same time settled the FTC's charges that NAMM had "permitted and encouraged" acts constituting violations of Section 5 of the FTC Act among its members and that the acts and practices of NAMM "constitute unfair methods of competition in or affecting commerce in violation of Section 5 of the Federal Trade Commission Act, as amended 15 U.S.C. § 45." The FTC also alleged that absent appropriate relief "such acts and practices, or the effects thereof will continue or recur . . ."

60.     Specifically, the FTC, after an investigation, alleged that between 2005 and 2007, NAMM organized various meetings and programs for its members, such as defendants herein, at which competing retailers of musical instruments were permitted and encouraged to exchange competitively sensitive information, strategies for implementing minimum advertised pricing and restrictions of retail price competition.

15

61.     The FTC alleged that the "challenged conduct served no legitimate business purpose and resulted in no significant efficiency benefits."

62.     According to the FTC's press release announcing NAMM's settlement of "FTC Charges of Illegally Restraining Competitions" "the FTC's proposed consent order is designed to remedy NAMM's anti-competitive conduct."  The Commission's vote to accept the complaint and the consent order was 4-0.

63.     According to the FTC's complaint, "at meetings and programs sponsored by NAMM, competing retailers of musical instruments and other NAMM discussed strategies for raising retail prices and exchanged information on competitively sensitive subjects such as prices, margins, minimum advertised price policies and their enforcement."

> According to the FTC, similar discussions were held among
> manufacturers.

64.     The conduct of the defendants was the cause of *supra* competitive price levels for products in the Fretted Instrument product market.  Music Merchandise Review, issue date October 2008, reported that Anthem Music Group's head D. Kilkenny observed "over the past several years instrument prices seem to be increasing at a greater rate than that of inflation . . ." According to The Music Trades "Annual Census of The Music Industries" published in 2009, in 2006, the average price of a guitar was $309, by 2007 the average price was $350 and by 2008 the average price was $372.  Thus, the defendants were able to increase aggregate sales from $1,022,861.00 in 2006 to 41,151,290.00 despite a 10% decline in unit sales.

65.     The FTC has alleged that no significant pro-competitive benefit was derived from the challenged conduct.  After analyzing the type of information involved, the level of detail, the absence of procedural safeguards, and overall market conditions, the FTC concluded that the exchange of information engineered by NAMM lacked a pro-competitive justification.

16

66.     The FTC has ordered NAMM to cease and desist from:

(a)     Entering into, adhering to, enforcing, urging, encouraging, advocating, suggesting, assisting or otherwise facilitating any Musical Product Manufacturer or Musical Product Dealer to enter into, adhere to or enforce any combination, conspiracy, agreement or understanding between or among any Musical Product Manufacturers of Musical Product Dealers relating to:

(i)     the retail price of any Musical Product;

(ii)     any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies; or

(iii)     the refusal to do business, or the reduction of business, with particular Musical Product Manufacturers or Musical Product Dealers.

(b)     Urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product dealers relating to:

(i)     the retail price of Musical Products; or

(ii)     any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies.

**D.      Anti-Competitive Effects of Defendants' Unlawful Conduct**

67.      The MAP policies imposed and enforced by Defendants here went well beyond typical cooperative advertising programs where manufacturers place restraints on the prices dealers may advertise in advertisements funded in whole or in part by the manufacturer.

68.      The MAP policies inflicted on music retailers by NAMM and manufacturers are anti-competitive.  According to a WALL STREET JOURNAL Report dated October 23, 2008, Bradley Reed, sales manager for Musician's Advocate, Inc. said "it [his company] had very little choice but to honor manufacturer's policies on advertised prices because otherwise it risks having its supplies cut off or being delisted as an authorized distributor."

69.      In large part, NAMM's concerted efforts were successful.  Despite that fact that NAMM and its members expressed their fear at the January 2001 NAMM trade show that the then-current gross margins of 27% to 32% would be chipped away even further by price competition, a Music Trades report published in 2008 provided that the music industry had gross margins of 30% versus approximately 22% gross margins for consumer electronics.

70.      Defendants' practices have had the following anti-competitive effects, among others, in the relevant market:

(a)      Competition in the relevant market has been unreasonably restrained, suppressed, and, in some cases, destroyed;

(b)      Potential competitors have been restrained from entering into the relevant market and have been prevented form competing effectively against defendants;

(c)      Purchasers of musical instruments have been denied the benefits of competition in a free and open market and have been forced to pay artificially high instrument prices;

18

(d)   Upon information and belief, defendants have enjoyed and will continue to enjoy, ultra competitive profits to the detriment of competitors and purchasers of musical instruments.

71.   The aforementioned anti-competitive effects of defendants conduct on competition in the relevant market outweigh any conceivable pro-competitive benefits.

**E.   Relevant Market**

72.   The relevant product market in this case is retail sales of products in the fretted instruments product category which includes guitars, amplifiers and accessories for the same.

73.   The relevant geographic market in this case is the United States of America.

74.   By virtue of their power to control prices and exclude competition in the relevant market(s), Defendants at all relevant times possessed market power in the relevant market(s). Moreover, at all relevant times Defendants possessed dominant shares of the market(s) for retail sales of musical instruments generally fretted instruments in particular.

75.   Likewise, Defendants at all relevant times possessed substantial market power in the market(s) for their products, due, in part, to the high level of product differentiation in the industry.  Specifically, Defendants:  (a) sold their musical instruments at prices substantially in excess of marginal costs, (b) enjoyed high profits margins thereon, (c) sold such products substantially in excess of the competitive price, and (d) enjoyed substantial barriers to market entry and growth.

76.   Defendants exchanged competitively sensitive information that had the purpose, tendency and capacity to facilitate price coordination among competitors.

77.   There is substantial concentration among the firms that manufacture the products in the relevant market(s).

19

78.     Defendants together imposed and enforced minimum retail price maintenance and minimum advertised price policies which were contrary to manufacturers' economic interests because each manufacturer rational economic goal was to increase sales volume rather than terminate retailers.

**F.     Market Effects of Defendants' Conduct**

79.     The overall effect of Defendants' anti-competitive, exclusive scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced musical instruments.  As alleged above, had Defendants not improperly foreclosed or stifled actual or potential competitors from competing in markets for the musical instruments, other actual or potential rival manufacturers would have achieved much greater sales than they actually did (or threatened to do), given the cheaper prices that they charged (or could have charged upon entry), and would have posed a far greater competitive threat to Defendants. Additionally, absent Defendants' exclusionary conduct, barriers to entry of the markets would have been lower, which:  (a) would have made it easier for existing or new competitors to enter or expand their positions in the market for the musical instruments, and (b) would have caused existing or potential competitors to be attracted to the musical instrument market because of the supra-competitive prices that Defendants were charging.  As a result, absent Defendants' misconduct, Defendants would have rationally perceived that there was a greater threat of potential competition in each of the relevant markets if Defendants did not reduce its supra-competitive prices.

80.     The presence of unfettered competition from actual or potential competitors, which were selling lower-priced musical instruments, would have forced Defendants to lower the prices

for its musical instruments in order to remain competitive and/or to counter a perceived threat of additional entry.

81.   As a result of Defendants' conduct, independent retailers could not compete with nationwide and/or multiregional claims because the retailers could not price-compete. Accordingly, retailers such as Guitar Center were able to raise prices above and beyond what they would be under competitive conditions.

82.   During the relevant period, Plaintiff and the other members of the Class purchased musical instruments directly from Defendants.  As a result of Defendants' alleged illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the musical instruments they purchased.  Plaintiff would have been able to, *inter alia*, purchase less-expensive musical instruments had potential competitors been able to engage in unfettered competition.  The prices that Plaintiff and the other Class members paid for musical instruments during the Class Period were substantially greater than the prices that Plaintiff and the Class members would have paid absent the illegal conduct alleged herein because:  (1) the prices of all musical instruments were artificially inflated by Defendants' illegal conduct; and (2) Class members were deprived of the opportunity to purchase musical instruments at substantially lower prices.  Thus, Plaintiff and the Class have, as a consequence, sustained substantial damages in the form of overcharges.

## VI.   CLASS ACTION ALLEGATIONS

83.   Plaintiff brings this action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All individuals and persons who purchased one or more Fretted Instrument Products from any of the defendants from January 1, 2005 through December 2007 ("Class Period").

Excluded from the Class are the Defendants, their co-conspirators, their respective parents, subsidiaries and affiliates, any judge or magistrate presiding over this action and members of their families, as well as any governmental entities.

84.     Plaintiff does not know the exact size of the Class since such information is exclusively in the control of Defendants.  Plaintiff believes that there are thousands of Class members, and that they are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

85.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged in this Complaint.

86.     Plaintiff will fairly and adequately protect the interests of the Class.  The interests of Plaintiff coincide with and are not antagonistic to, those of the Class.  In addition, Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

87.     There are questions of law and fact common to the members of the Class, and those common questions predominate over any questions that may affect only individual members of the Class, because Defendants have acted on grounds generally applicable to the entire class.  Among the predominant questions of law and fact common to the Class are:

(a)     whether Defendants engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition and limiting purchaser access to competing and lower-priced FI Products;

(b)     whether Defendants unreasonably restrained trade;

22

       (c)     whether Defendants' anti-competitive contracts, combinations, and conspiracies have caused Plaintiff and the other members of the Class or Subclasses to suffer antitrust injury in the nature of overcharges;

       (d)     whether Defendants' unlawful conduct caused Plaintiff and the other members of the Class or Subclasses to pay more for the FI Products than they otherwise would have paid;

       (e)     the appropriate Class- or Subclass-wide measure of damages; and,

       (f)     whether Defendants' anti-competitive conduct is continuing, thus entitling the Class or Subclasses to injunctive relief to promote unrestrained trade and free and fair competition.

       88.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties likely to be encountered in management of this class action.  There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative exists for the fair and efficient adjudication of this controversy on behalf of Plaintiff and the members of the Class.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, AND EQUITABLE TOLLING

89.     Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until the FTC issued a press release in March 2009.

90.     Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations.

91.     Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiff and the Class or Subclasses assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

92.     Defendants continued to engage in the deceptive practice, and consequently, unwary consumers were injured on a daily basis by Defendants' unlawful conduct.  Therefore, Plaintiff and the Class or Subclasses submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a member of the Class or Subclasses purchased a FI Product constitutes part of a continuing violation and operates to toll the statutes of limitation in this action.

93.     Defendants are estopped from relying upon any statute of limitations defense because of its unfair or deceptive conduct.

94.     Defendants' conduct was and is, by its nature, self-concealing.  Still, Defendants, through a series if affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiff and the Class or Subclasses from learning of their illegal, anti-competitive, unfair and/or deceptive acts.

95.     By reason of the foregoing, the claims of Plaintiff and the Class or Subclasses are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## FIRST CLAIM FOR RELIEF
### (Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1)

96.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

97.     Beginning in 2005, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants and their co-conspirators, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

98.     In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the price of FI Products sold in the United States.

99.     As a result of Defendants' unlawful conduct, prices for FI Products were raised, fixed, maintained and stabilized in the United States.

100.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and/or concerted action among defendants and their co-conspirators.

101.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including, but in no way limited to:

a.      Participating in meetings and conversations to discuss the prices and supply of FI Products;

25

b.      Communicating in writing and orally to fix target prices, floor prices and supply of FI Products;

c.      Exchanging competitively sensitive information among each other to facilitate their conspiracy, including minimum advertised pricing, strategies for raising retail prices, restricting retail price competition;

d.      Agreeing to manipulate prices and supply of FI Products sold in the United States in a manner that deprived direct purchasers of free and open competition; and,

e.      Selling FI Products to customers in the United States at non-competitive prices.

102.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class or subclasses were injured in their business and/or property in that they paid more for FI Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A.      The court determine that this action may be maintained as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages, and declaring Plaintiff as the representative of the Class and his counsel as counsel for the Class;

B.      The Court declare the conduct alleged herein to be unlawful in violation of the federal antitrust laws and the common law of unjust enrichment;

C.      Plaintiff and each member of the Class recover the amounts by which the Defendants have been unjustly enriched in accordance with State law;

D.      Defendants be enjoined from continuing the illegal activities alleged herein;

E.     Plaintiff and the Class recover the costs of this suit, including reasonable attorney's fees and expenses as provided by law; and,

F.     Plaintiff and the Class be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.


DATED:  September 28, 2009

PRICE WAICUKAUSKI & RILEY, LLC


By: _____
Heather A. Barnes (263107)
William N. Riley (IN Bar No. 14941-49) (*pro hac vice* pending)
Joseph N. Williams (IN Bar No. 25874-49) (*pro hac vice* pending)
PRICE WAICUKAUSKI & RILEY, LLC
301 Massachusetts Avenue
Indianapolis, Indiana  46204
Telephone:  (317) 633-8787
Facsimile:   (317) 633-8797
E-Mail: hbarnes@price-law.com
        wriley@price-law.com
        jwilliams@price-law.com

*Attorneys for Plaintiff*

**JS 44** (Rev. 12/07)

# CIVIL COVER SHEET

**FILED**
SEP 30 2009
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Rory W. Collins

**DEFENDANTS**
Guitar Center, Inc. and Nat'l Ass'n of Music Merchants, Inc.

**(b)** County of Residence of First Listed Plaintiff   Marion County, Ind.
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Los Angeles County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Price Waicukauski & Riley, LLC
301 Massachusetts Avenue, Indianapolis, IN 46204

Attorneys (If Known)

**'09 CV 2151 JAH   JMA**

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** ☐ 362 Personal Injury - Med. Malpractice | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 365 Personal Injury - Product Liability | **PROPERTY RIGHTS** ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** ☐ 710 Fair Labor Standards Act | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 740 Railway Labor Act | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | **FEDERAL TAX SUITS** ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | | **IMMIGRATION** ☐ 462 Naturalization Application | | |
| | | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Section 1 of the Sherman Antitrust Act, 15 U.S.C. 1
Brief description of cause:
Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. 1

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE Hon. Larry A. Burns   DOCKET NUMBER 3:09-cv-02002-LAB-JMA

DATE 09/28/2009
SIGNATURE OF ATTORNEY OF RECORD _Heather Burns_

FOR OFFICE USE ONLY
RECEIPT # 5807   AMOUNT $350.00   APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

CP   MS 10/01/09

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    (a) Plaintiffs-Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.    Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.    Residence (citizenship) of Principal Parties. This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.    Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.    Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.    Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity.    Example:    U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

VII.    Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    Related Cases. This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS005807
Cashier ID: msweaney
Transaction Date: 10/01/2009
Payer Name: PRICE WAICUKAUSKI LLC
--------------------------------
CIVIL FILING FEE
 For: COLLINS V GUITAR CENTER
 Case/Party: D-CAS-3-09-CV-002151-001
 Amount:       $350.00
--------------------------------
CHECK
 Check/Money Order Num: 8806
 Amt Tendered:  $350.00
--------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```